UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTINA MARIE (CONSOLO) MALIK,

      Plaintiff,

v.

UNUM LIFE INSURANCE COMPANY OF AMERICA,

      Defendant.

_____/

Case No. 18-13628

Stephanie Dawkins Davis
United States District Judge

**OPINION AND ORDER GRANTING MOTION FOR JUDGMENT
ON THE ADMINISTRATIVE RECORD (ECF No. 11)**

## I.    PROCEDURAL HISTORY

Plaintiff, Christina Marie Malik (f/k/a Christina Marie Consolo), filed this action under Section 502 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132 (ERISA), seeking reinstatement of her long-term disability benefits through her employer-sponsored benefit plan. (ECF No. 1). Defendant, Unum Life Insurance Company of America, filed the administrative record on April 30, 2019. (ECF No. 9). Unum and Malik filed cross motions for judgment on the record on September 30, 2019. (ECF Nos. 11, 12). They timely filed their respective responses (ECF No. 13, 14) and replies (ECF No. 15, 16). The court determined that a hearing on the pending motions was not necessary. For the

reasons set forth below, the court **GRANTS** Unum's motion for judgment on the record.

## II.    FACTUAL BACKGROUND

### A.    Malik is Awarded Disability Benefits Effective August 2008.

Malik worked as an ophthalmic photographer for Associated Retinal Consultants until August 29, 2008.  (ECF No. 9-2, PageID.111, 157).  The physical requirements of her job were "light" and required "standing, bending, sitting, walking, pulling, and lifting."  (ECF No. 9-2, PageID.157; ECF No. 9-3, PageID.709).

Due to moving heavy medical equipment, Malik applied for disability benefits under a policy that Unum issued to her employer (the "Policy"), alleging a disability onset date of August 29, 2008.  (ECF No. 9-2, PageID.147, 387; ECF No. 9-4, PageID.1399).  In her application, she alleged that she was disabled due to low back pain, muscle spasms, a history of Guillain-Barre syndrome, fibromyalgia, scoliosis, and depression.  (ECF No. 9-18, PageID.3472).  As relevant to Malik, the Policy defines "disability" as follows:

> You are disabled when Unum determines that:
>
> > --you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and

2

--you have a 20% of more loss in your indexed
monthly earnings due to the same sickness or
injury.

After 24 months of payments, you are disabled when
Unum determines that due to the same sickness or injury,
you are unable to perform the duties of any gainful
occupation for which you are reasonably fitted by
education, training, or experience.

You must be under the regular care of a physician in
order to be considered disabled.

(ECF No. 9-1, PageID.66).  The Policy defines "gainful occupation" as "an

occupation that is or can be expected to provide you with an income at least equal

to 80% of your indexed monthly earnings within 12 months of your return to

work."  (ECF No. 9-1, PageID.85).  Malik was 39 years old when she first applied

for benefits under the Policy.  (ECF No. 9-2, PageID.147).

Although Unum initially denied Malik's application for benefits (ECF No.

9-2, PageID.413–17), it reversed its decision after she appealed and submitted

additional medical documentation.  (ECF No. 9-2, PageID.574; ECF No. 9-3,

PageID.717–20).  On appeal, an independent medical examiner (the "IME")

reviewed her file and noted that her symptoms were "subjective in nature" but that

her course of treatment was consistent with an ongoing pain syndrome.  (ECF No.

9-3, PageID.684).  The IME concluded that the available information was "not

inconsistent" with a restriction from full-time light level work from August 2008

through June 2009, based on her "self described symptoms, and the continuing

treatment from [her doctor]." (*Id.*)  The IME also noted that her status as of the date of the review—January 6, 2010—was unclear, because her treatment records were only dated through June 2009.  (*Id.* at PageID.684, 715).  Unum awarded Malik benefits effective November 27, 2008.  (*Id.* at PageID.715, 717, 734).

>    **B.    Malik's Application for Social Security Disability Benefits is Denied.**

Malik applied for Social Security disability benefits, but the Social Security Administration denied her claim in a written decision issued by an administrative law judge on March 29, 2012.  (ECF No. 9-4, PageID.1168–69).  She did not appeal that decision.  (ECF No. 9-6, PageID.1950).

>    **C.    Unum Requests Information to Determine Malik's Continued Entitlement to Benefits.**

Over the next several years, Unum episodically requested updated information from Malik and her doctors to determine whether she continued to be disabled within the meaning of the Policy.  (*See, e.g.*, ECF No. 9-3, PageID.1051).  On March 19, 2012, Malik informed Unum that she "cannot walk around or pain in back is unbearable," and that she generally only engaged in "reading, when not in pain, but some days [the pain is] so severe I can't even do that."  (ECF No. 9-4, PageID.1110–11).  On April 4, 2012, Dr. Kpadenou, Malik's primary care provider, opined that Malik "is completely disabled" and "unable to work" due to fibromyalgia, chronic fatigue syndrome, and back pain.  (ECF No. 9-3,

4

PageID.1088–89; ECF No. 9-4, PageID.1415).  About two years later, on May 26, 2014, Malik informed Unum that her "entire day is spent trying to manage pain" and that "pain severely affects my concentration, making most days impossible to read or research anything."  (ECF No. 9-6, PageID.1768–69).  On May 27, 2014, Malik's new primary care provider, Dr. Neumann, advised Unum that Malik had fibromyalgia, back pain, and a sleep disorder.  (*Id.* at PageID.1772, 1774).  He opined that, due to these conditions, Malik was unable to lift more than 10 pounds and had difficulty with sitting and standing for longer than 30 minutes.  (*Id.* at PageID.1773).  Malik also indicated that she treated with Dr. Gowda, an infectious disease specialist.  (ECF No. 9-4, PageID.1415).  But Dr. Gowda only saw Malik once and repeatedly advised that she was unable to complete Unum's disability forms.  (ECF No. 9-4, PageID.1415; ECF No. 9-6, PageID.1815, 1839; ECF No. 9-7, PageID.2096).

> **D.** **While Malik Was Receiving Disability, Her Social Media Accounts Revealed Active Participation in the Radiation Research Community.**

While Malik was complaining of debilitating pain, Unum discovered that she was very active in researching and writing about radiation issues from 2011 until at least March 2014.  (ECF No. 9-14, PageID.2445).  For example, Malik wrote an article in mid-2012 in which she said that she "maintains several websites to teach people about radiation, mitigation, and other nuclear issues" and that

"[s]he is also the host of 'Nuked Radio' Tuesdays & Thursdays from 12-1:00pm

EST on the Orion Talk Show Network."  (*Id.* at PageID.1189).  Malik's LinkedIn

profile indicates that she hosted 117 episodes of her radio show between March

2012 and June 2013.  (ECF No. 9-5, PageID.1675).  By January 2014, Malik

claimed in one of her articles that she "estimate[s] that [she] ha[s] read over 9,000

studies and research papers in the last three years."   (ECF No. 9-12, PageID.2338).

In that article, Malik also noted that she "ha[s] a team of approximately 20 trusted

volunteers, who all share common and deeply felt beliefs and concerns about

[radiation issues]."  (*Id.* at PageID.2339).  According to her LinkedIn page, Malik

also founded RadChick Radiation Research & Mitigation in 2011.  (ECF No. 9-5,

PageID.1675).  The group's Facebook page, which indicates that it is "[a]lways

open," amassed 14,000 "likes" by 2015.  (ECF No. 9-8, PageID.2114, 2116).

Malik also maintained a Twitter feed, @RadChick4Cast, which she created in

2012.  (ECF No. 9-9, PageID.2200; ECF No. 9-14, PageID.2450).  As of June

2015, she had 1,727 followers and had posted 21,100 tweets.  (ECF No. 9-14,

PageID.2450).  In addition to her radiation research, Malik was convicted of a

felony marijuana delivery and manufacturing offense in 2010.  (ECF No. 9-4,

PageID.1231).  Although she claimed that her marijuana was for medical purposes,

she ultimately served one day in jail.  (*Id.*; ECF No. 9-16, PageID.2872, 2876).

Her social media accounts also revealed that she hiked several nature trails in May, July, and August of 2014.  (ECF No. 9-13, PageID.2365, 2369–70, 2379–80).

### E.   Unum Determines that Malik is No Longer Disabled Within the Meaning of the Policy.

Beginning in December 2014, Malik underwent a series of medical tests related to her alleged disabilities, all of which essentially revealed normal results. For example, on December 4, 2012, Malik underwent an MRI of her cervical spine, which revealed a minimal disc bulge at C2-C3, but all other findings were normal or unremarkable.  (ECF No. 9-6, PageID.1967).  The next day, an MRI of her lumbar spine returned unremarkable findings.  (*Id.* at PageID.1969).  In May 2015, Malik reported to urgent care, alleging that she "hit[] her head al[l] week falling backwards"; however, the urgent care examination did not find anything. (ECF No. 9-7, PageID.2087).  In September 2015, Unum repeatedly requested for Dr. Neumann to provide an updated opinion as to Malik's disability, to no avail. (ECF No. 9-16, PageID.2719, 2721, 2729).

On October 6, 2015, Dr. Krell conducted an independent review of the available evidence and concluded that the restrictions and limitations that Dr. Neumann recommended were not supported by the record.  (ECF No. 9-16, PageID.2734).  Specifically, Dr. Krell noted that Malik's scoliosis was so mild as to be "asymptomatic."  (*Id.*)  As to her fibromyalgia and chronic fatigue syndrome,

Dr. Krell found that they were referenced in the record but that it was devoid of "documentation of commensurate care and monitoring that would be expected with report[s] of severe, ongoing, and impairing pain or fatigue." (*Id.*) He concluded that her reported symptoms were "out of proportion" with documented findings, specifically noting that "continued physical and occupational activity is recommended" for fibromyalgia and chronic fatigue syndrome. (*Id.*) Dr. Krell also observed that Dr. Neumann issued his recommendations over a year ago and did not repeat them, despite Unum's requests for updates. (*Id.*) Dr. Krell opined that Malik's other alleged ailments (Guillain-Barre syndrome; IBS; mitral valve prolapsed; asthma; and depression) did not rise to a level that would render her disabled. (*Id.*)

On October 10, 2015, Dr. Sentef, a designated medical officer, reviewed Malik's records and agreed with Dr. Krell that Dr. Neumann's recommendations were not supported by the record. (ECF No. 9-16, PageID.2739). Dr. Sentef agreed that Malik's MRIs revealed "no significant pathology related to [her] back" and found that "[c]ervical, thoracic, and lumbar MRIs show mild degenerative changes consistent with the claimant's age." (*Id.*) He noted that no EMG or nerve study supported a finding of a more serious condition. (*Id.*) As to her fibromyalgia, Dr. Sentef noted that the "[c]ornerstone treatment" for this condition includes water aerobics, along with lifestyle changes in diet, exercise, and sleep

hygiene.  (*Id.*)  Indeed, he wrote that "[i]ncreased activity is the norm for individuals with fibromyalgia rather than decreased activity."  (*Id.*)  As to her alleged chronic fatigue syndrome, Dr. Sentef opined that she does not meet the CDC-specified criteria for this condition.  (*Id.*)  He concluded that "[t]here is no support for chronic fatigue syndrome" in the record.  (*Id.*)

Over the next few months, Unum received additional medical records from Dr. Neumann.  (ECF No. 9-16, PageID.2756).  As relevant here, these records included a treating note dated August 22, 2015, indicating that Malik complained of "back pain" that may be treatable with a "possible shot"; a November 30, 2015 treatment note indicated that Malik requested "some more shots" and a follow-up with a neurologist.  (*Id.* at PageID.2760, 2851).  Drs. Krell and Sentef reviewed this new medical documentation and concluded that Malik was not disabled, as these documents showed only minimal abnormalities that would be asymptomatic. (ECF No. 9-16, PageID.2766, 2772, 2860, 2865).

Unum repeatedly attempted to contact Malik to discuss her claim, but she did not return their calls.  (ECF No. 9-16, PageID.2885).  Unum issued a letter terminating Malik's disability benefits effective January 9, 2016.  (*Id.* at PageID.2895).  It is this termination that Malik now challenges through the instant lawsuit.

**F.** **Within Days of Receipt of Unum's Denial of Benefits, Malik Repeatedly Presents to the Emergency Room, but Diagnostic Testing Reveals Essentially Normal Results.**

Malik received notice of Unum's denial of benefits on January 26, 2016. (ECF No. 9-17, PageID.2924).  Shortly thereafter, on February 4, 2016, Malik presented to the emergency room, complaining of chest pain and confusion.  (*Id.* at PageID.3223).  A brain CT scan and a chest x-ray showed no abnormal results, although an MRI of her brain showed "mild" chronic small vessel ischemic disease.  (*Id.* at PageID.3226).  Two weeks later, Malik presented again to the emergency room with complaints of chest pain, but she was discharged with unremarkable and mild CT and MRI findings.  (*Id.* at PageID.3265–66, 3269, 3282, 3284, 3286, 3288).  A few days later, she presented again to the hospital, complaining of pain and muscle weakness.  (*Id.* at PageID.3299, 3301, 3303).  But she was sent home because "there is nothing else [the hospital] can offer her" when "all tests are normal."  (*Id.* at PageID.3301).

On March 8, 2016, Malik presented for a neurosurgery consultation, complaining of "attacks," neck spasms, and a variety of other ailments.  (*Id.* at PageID.3048–49).  She claimed that her first "attack" occurred on February 4, 2016.  (*Id.*)  Malik was prescribed a cervical collar due to "cervicogenic headache" and to "support [her] neck during [an] attack."  (*Id.* at PageID.3051).  In April, May, and June of 2016, Malik presented for four additional neurosurgery

consultations, complaining of ailments ranging from a "cardiac event," to muscle spasms, to "spells" and "attacks."  (*Id.* at PageID.3147, 3149, 3151, 3060).  CT scans of her head and neck taken on April 29, 2016 revealed normal and mild results.  (*Id.* at PageID.3052, 3054–55).  On June 16, 2016, Malik experienced a "minor spell" in front of the treating neurosurgeon, who described it as follows:

> [S]udden onset of flaccidity of the face.  Eyes sagged and her speech altered, with voice becoming extremely soft and barely audible.  She appeared to be conscious, but response times were much prolonged.  Involuntary movements were not noted.  The patient recovered within several seconds without obvious residual deficit.

(*Id.* at PageID.3060).  Because the specialist found that diagnostic testing was inconsistent with her reported symptoms, he found that she had "[m]ultiple medically unexplained symptoms" and recommended a psychiatric consultation.  (*Id.* at PageID.3060–61).  One day later, Malik called 9-1-1, claiming that she had difficulty breathing.  (*Id.* at PageID.3038).  She was transported to the hospital as a "non emergency" case.  (*Id.*)  The next day, Malik presented again to the hospital, complaining of chronic muscle spasms.  (*Id.* at PageID.3307).  The treating physician noted that her "physical examination was within normal limits, but the patient continues to insist she is having muscle spasms."  (*Id.* at PageID.3312).  A psychiatric consultation performed on June 19, 2016 observed that Malik "is planning to apply for disability, which was rejected in the past, which could be

seen as a secondary gain regarding her persistent hospitalizations and reputation of neurological assessment and tests." (*Id.* at PageID.3316).

In August 2016, Malik spent five days in an epilepsy monitoring unit, which yielded unremarkable results. (*Id.* at PageID.3066, 3090). A retinal examination conducted in September 2016 indicated "[n]o retinal etiology to explain current visual symptoms." (*Id.* at PageID.3106–07). Malik underwent a neuro-psychiatric consultation on September 14, 2016, which showed "normal functioning across most cognitive domains" and noted that "symptom amplification could be present as she attempts to make sense of her sudden drops and difficulty breathing, but I do not get a history of recent acute stressors to trigger these episodes at this point in her life." (*Id.* at PageID.3170, 3172). Her examiner also noted that Malik arrived in a wheelchair but did not indicate whether such a device was prescribed. (*Id.* at PageID.3171). He also noted that she may have sleep apnea based on her reported symptoms. (*Id.* at PageID.3172). A neuro-ophthalmology consultation conducted on October 26, 2016 concluded that epileptic seizures were "ruled out" and that her "spells" "do not resemble any migraine descriptions of which I am aware." (*Id.* at PageID.3105).

### G.    Unum Denies Malik's Appeal.

In a letter dated January 2, 2017, Malik appealed Unum's denial effective January 9, 2016. (ECF No. 9-17, PageID.3114). A third independent medical

reviewer, Dr. McAllister, reviewed the medical record and concluded in January 2017 that the denial of Malik's claim was appropriate. (*Id.* at PageID.3464). In particular, Dr. McAllister opined that "[w]hile it is noted that the claimant has received extensive testing and evaluation for multiple new complaints (that were not consistently noted prior to February 2016), the testing has noted no significant abnormalities or definitive explanation for the claimant's multiple symptoms." (*Id.* at PageID.3461). As to Malik's neck and back pain, Dr. McAllister noted that her complaints were not supported by MRI scans, as there was no evidence of neurologic abnormalities. (*Id.* at PageID.3462). And the recent records (dating 2015-2017) did not reflect ongoing or consistent pain management treatment that would be expected for someone in debilitating pain. (*Id.*) With respect to Malik's "attacks," Dr. McAllister noted that the record does not reflect consistent or ongoing complaints of these episodes prior to February 2016—after Unum denied her benefits. (*Id.*) He opined that Malik's neurologic examinations "have repeatedly been normal" and that there were no abnormalities found despite EEG monitoring, neurology consults, neurosurgery consults, CT scans, and cardiac pathology studies. (*Id.*) And, although Malik repeatedly presented to the emergency room due to these attacks, "the records do not document any significant injury sustained as a result of a fall or evidence of any injuries sustained in accidents due to passing out." (*Id.*) Turning to Malik's claimed cognitive

difficulties, Dr. McAllister noted that neuropsychological testing yielded normal cognition and that the records do not reflect ongoing psychiatric or psychological treatment. (*Id.*) He also noted that, during her psychiatric consultation, the treating physician noted that she was "refusing any psychiatric medication" and that her "persistent hospitalizations" were potentially motivated by her intent to apply for disability after Unum had denied her benefits. (*Id.*) As to Malik's alleged sleep apnea, Dr. McAllister opined that her "mild" sleep apnea could be cured by a CPAP as needed and "would not reflect a need for restrictions or limitations." (*Id.* at PageID.3463) With respect to her alleged migraines, "the records do not reflect aggressive medication management with either prophylactic or abortive headache medications." (*Id.* at PageID.3463) Finally, although Malik claimed that she is wheelchair-bound and relies on a cervical collar, Dr. McAllister noted that "the records do not reflect any definitive pathology that would necessitate the use [of these devices]." (*Id.* at PageID.3463) And the records prior to February 2016 "do not reflect the use of any assistive device for ambulation or the use of a cervical collar." (*Id.*)

## III.   DISCUSSION

### A.   Standard of Review

The parties agree that the proper standard of review in this matter is de novo. (*See* ECF No. 5, PageID.21) Under this standard, "the role of the court reviewing

denial of benefits 'is to determine whether the administrator . . . made a correct decision.'" *Hoover v. Provident Life and Acc. Ins. Co.*, 290 F.3d 801, 808–09 (6th Cir. 2002) (quoting *Perry v. Simplicity Eng'g*, 900 F.2d 963, 965 (6th Cir. 1990)). The administrator's decision is accorded no deference or presumption of correctness. *Id.* at 809. The review is limited to the record before the administrator, and the court must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan. *Id.* Reviewing this case under the *de novo* standard, the court concludes that Unum properly terminated Malik's benefits.

**B.    Malik Was Not Disabled Within the Meaning of the Policy.**

The question in this case is whether Malik was disabled within the meaning of the Policy on January 9, 2016. The Policy divides claimants into two categories: those who have received 24 months of payments or less, and those who have received more than 24 months of payments. Unum awarded Malik benefits on November 27, 2008 and terminated her benefits on January 9, 2016. (ECF No. 9-3, PageID.715, 717, 734; ECF No. 9-16, PageID.2895). Therefore, Malik falls into the latter category.

Under the Policy, after an individual has received 24 months of payments, she is disabled if "due to the *same* sickness or injury" she is "unable to perform the duties of any gainful occupation for which [she] [is] reasonably fitted by education,

training, or experience." (ECF No. 9-1, PageID.66) (emphasis added). When

Malik applied for disability, she alleged that she suffered from low back pain,

muscle spasms, a history of Guillain-Barre syndrome, fibromyalgia, scoliosis, and

depression. (ECF No. 9-18, PageID.3472). Therefore, the question is whether

Malik was unable to perform any gainful activity due to these ailments on January

9, 2016—the date that Unum terminated her benefits.

The court concludes that Malik was not disabled within the meaning of the

Policy on January 9, 2016. To begin with, two medical professionals, Drs. Krell

and Sentef, conducted a review of Malik's medical record in 2015 and concluded

that it did not support a finding of disability. (ECF No. 9-16, PageID.2734, 2739).

In reaching this conclusion, the doctors relied on objective medical testing, which

consistently revealed mild or unremarkable results. (*Id.* at PageID.2734, 2739;

ECF No. 9-17, PageID.3461–64). In fact, Dr. Krell went so far as to opine that her

reported symptoms were "out of proportion" with documented findings. (ECF No.

9-16, PageID.2734). Of note, both Drs. Krell and Sentef said that Malik's

principal ailment, fibromyalgia, is generally treated via increased, not decreased,

activity. (*Id.* at PageID.2739). Although Malik's primary care provider opined a

year prior that she was disabled, "[n]othing in the Act [ERISA] itself . . . suggests

that plan administrators must accord special deference to the opinions of treating

physicians. Nor does the Act impose a heightened burden of explanation on

administrators when they reject a treating physician's opinion." *Black & Decker*

*Disability Plan v. Nord*, 538 U.S. 822, 830–31 (2003).  And despite Unum's

requests in September 2015 for Dr. Neumann to provide an updated opinion as to

Malik's disability, he declined to do so.  (ECF No. 9-16, PageID.2719, 2721,

2729).  It is also noteworthy that Malik applied for disability benefits with the

Social Security Administration several years prior, but it denied her application in

a written decision issued on March 29, 2012.  (ECF No. 9-4, PageID.1168–69).

Next, Malik's substantial social media activity from 2011 through 2014

strongly suggests that her reported symptoms were not as severe as she claimed

them to be.  Although Malik argues that "her history of a temporary ability to

devote a few hours a week to a podcast and a Facebook page, from her bed, is not

indicative of an ability to hold down a job," (ECF No. 12, PageID.3555), the court

disagrees.  Among other things, Malik self-reported that she "read over 9,000

studies and research papers" from 2011 until 2014, hosted 117 episodes of her

radio show between March 2012 and June 2013, managed a team of

"approximately 20 trusted volunteers," and posted 21,100 tweets to her Twitter

account.  (ECF No. 9-5, PageID.1675; ECF No. 9-12, PageID.2338–39; No. 9-14,

PageID.2450).  These activities cast doubt on Malik's reports to Unum concerning

the severity of her symptoms, such as her May 26, 2014 statement that her "entire

day is spent trying to manage pain" and that "pain severely affects my

concentration, making most days impossible to read or research anything." (ECF No. 9-6, PageID.1768–69). This May 2014 statement is particularly dubious considering that, only days later, she hiked a nature trail and posted photos to her personal Facebook page, noting that "[a] great walk is always better with a good camera." (ECF No. 9-13, PageID.2379). Her social media activity, if nothing else, calls into question whether her symptoms were as severe as she claimed them to be in her correspondence with Unum.

A review of the medical records that Malik submitted in support of her internal appeal of Unum's termination of benefits further indicates that she was not disabled on January 9, 2016. As Dr. McAllister noted, the record does not reflect consistent or ongoing complaints of her "attacks"—her predominate complaint on appeal—prior to February 2016. (ECF No. 9-17, PageID.3462). Thus, even if the record demonstrated that Malik was the victim of these "attacks," her disability claim would fall short because it would not be due to the *same* sickness or injury as required by the Policy. (ECF No. 9-1, PageID.66). Moreover, as indicated above, Malik's medical records from 2016 consistently revealed unremarkable and normal results. For example, despite numerous consultations with neurologists and neurosurgeons, Malik's neurologic examinations were repeatedly normal, and her doctors found no abnormalities despite EEG monitoring, neurology consults, neurosurgery consults, CT scans, and cardiac pathology studies. (ECF No. 9-17,

PageID.3147, 3149, 3151, 3060, 3462).  Indeed, after presenting to the hospital for the third time in February 2016, she was sent home because "there is nothing else [it] can offer her" when "all tests are normal."  (*Id.* at PageID.3301).  During one of her neurology consultations, a specialist opined that she had "[m]ultiple medically unexplained symptoms" and even recommended a psychiatric consultation.  (*Id.* at PageID.3060–61).  And at that psychiatric consultation, the doctor observed that Malik "is planning to apply for disability, which was rejected in the past, which could be seen as a secondary gain regarding her persistent hospitalizations and reputation of neurological assessment and tests."  (*Id.* at PageID.3316).  In short, the objective medical evidence from 2016 demonstrates that Malik was not disabled within the meaning of the Policy on January 9, 2016.

For her part, Malik makes several attempts to show that the administrative record supports a finding of disability, but to no avail.  For example, although she devotes much of her brief to quoting the medical jargon contained throughout the record (ECF No. 12, PageID.3543–51), she declines to explain the import of this information.  For instance, she does not say what relation, if any, these issues have to the "same sickness or injury" of which she complained in August 2008.  Nor does she explain how this jargon demonstrates that she is disabled notwithstanding the essentially normal medical testing discussed above.  In addition, Malik relies on the sworn statements of Dr. Kpadenou, her former primary care physician, and

herself.  (ECF No. 12, PageID.3543–44, 3551–53).  But, Dr. Kpadenou's statement was dated November 12, 2009—seven years preceding Unum's decision to terminate her benefits.  Therefore, although this statement may have shed light on the degree of Malik's limitations in 2009, it says little of her condition in 2016. Moving to Malik's sworn statement, many of the strongest allegations contained in that statement are not supported by objective evidence.  For example, Malik alleges that she fell and hit her head on the corner of a desk in April 2015.  (ECF No. 9-17, PageID.3019).  But she fails to direct the court to evidence in the medical record documenting such an injury.  Indeed, the court's review of the medical records reveals that although Malik reported to urgent care in May 2015— one month later—due to "hit[ing] her head al[l] week falling backwards," the urgent care examination did not find anything.  (ECF No. 9-7, PageID.2087).  And upon review of her 2016 medical records, Dr. McAllister observed that "[w]hile the records reflect that the claimant has gone to the ER multiple times due to these reported attacks, the records do not document any significant injury sustained as a result of a fall or evidence of any injuries sustained in accidents due to passing out."  (ECF No. 9-17, PageID.3462).  Similarly, although Malik argues that her need for a wheelchair renders her disabled (*see, e.g.*, ECF No. 12, PageID.3537), the only evidence that she cites that a doctor prescribed a wheelchair is her own statement to this effect (*id.* at PageID.3552 (citing ECF No. 9-17, PageID.3022)).

Last, Malik relies on medical evidence that is not part of the administrative record.

(ECF No. 12, PageID.3542).  But, the court's *de novo* review of a plan

administrator's decision is limited to the record that was before the administrator.

*Hoover*, 290 F.3d at 809.  Therefore, her reliance on information outside of that

record is not persuasive.

### C.    Additional Arguments

In addition to her reliance on the administrative record, Malik makes two

more arguments for why Unum wrongly terminated her benefits.  First, she argues

that she is entitled to benefits because the plan administrator failed to properly

evaluate her claim by declining to conduct an in-person examination.  (ECF No.

12, PageID.3556).  Second, she argues that Unum was required to document

improvement in her condition.  (*Id.* at PageID.3556–57).  Neither argument

prevails.

#### i.    Unum Was Not Required to Conduct an In-Person Examination of Malik Prior to Terminating Her Benefits.

First, Unum was not required to examine Malik in person prior to

terminating her benefits.  The Sixth Circuit has held that "the failure to conduct a

physical examination—especially where the right to do so is specifically reserved

in the plan—may, in some cases, raise questions about the thoroughness and

accuracy of the benefits determination." *Calvert v. Firstar Fin., Inc.*, 409 F.3d

286, 295 (6th Cir. 2005).  But Malik does not allege that the Policy reserved the

right to undergo an in-person examination prior to termination or denial of

benefits.  The court's own review of the Policy shows that Unum "may" require a

physical examination in determining disability.  (ECF No. 9-1, PageID.66).

However, there is no language requiring such an examination, and *Calvert* also

noted that "there is nothing inherently improper with relying on a file review, even

one that disagrees with the conclusions of a treating physician."  409 F.3d at 297

n.6.  Although *Calvert* indicated that file review "may be inadequate" where "the

conclusions from that review include critical credibility determinations regarding a

claimant's medical history and symptomology," such is not the case here.  *Id.*

Unum's physicians based their conclusions on the objective medical evidence,

which, as discussed in detail above, consistently showed unremarkable, mild, and

normal findings.

Similarly, Malik, relying on *Chamness v. Liberty Life Assurance Co. of
Boston*, 234 F. Supp. 3d 885, 894–95 (W.D. Mich. 2017), argues that an in-person

examination was imperative here because she suffers from fibromyalgia "brain

fog."  (ECF No. 12, PageID.3556; ECF No. 16, PageID.3609).  The court does not

find this argument persuasive.  In *Chamness*, the Western District of Michigan,

citing *Okuno v. Reliance Standard Life Ins. Co.*, 836 F.3d 600, 610 (6th Cir. 2016),

observed that "[f]ile reviews are particularly questionable as a basis for an

administrator's determination to deny benefits where the claim . . . involves a

mental illness component." *Id. Chamness* reasoned that an in-person examination is often necessary for claims involving mental illness because "[p]sychiatrists generally rely on self-reporting to diagnose and treat subjective complaints" and so "[a]ccurately assessing the mental health of an individual . . . generally requires interviewing the patient and spending time with the patient, such that a purely record review will often be inadequate . . . ." 234 F. Supp. 3d at 894–95 (internal quotations and citations omitted). In arguing that her "brain fog" constitutes a mental illness, Malik relies on the same November 2009 statement of Dr. Kpadenou discussed above. (ECF No. 16, PageID.3609). But, as already stated, although this statement may be indicative of her mental state in 2009, it sheds little light on the state of Malik's ailment on January 9, 2016—the relevant date in this case. To the extent Malik argues that she was disabled due to depression, Drs. Kpadenou and Neumann, her former and current primary care providers, opined that she was disabled due to physical ailments, specifically fibromyalgia, chronic fatigue syndrome, back pain, and a sleep disorder. (ECF No. 9-3, PageID.1088–89; ECF No. 9-4, PageID.1415; ECF No. 9, PageID.1772, 1774). Moreover, as previously noted, the psychiatrist who examined her on June 19, 2016 characterized Malik's behavior in making frequent hospital visits and seeking neurological assessments as relating to her desire to obtain secondary gain by way of disability benefits. Simply put, no mental illnesses are at issue in this case.

### ii.   Unum Was Not Required to Document an Improvement in Malik's Condition to Support its Benefits Decision.

Next, Malik cites *Morris v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x. 978 (6th Cir. 2010), and argues that where a plan administrator found a claimant to be disabled but later found the claimant not to be disabled, then he or she is required to identify some improvement in the claimant's physical condition.  (ECF No. 12, PageID.3556–57).  Malik is incorrect.  As a preliminary matter, the standard of review applicable in *Morris* was arbitrary and capricious, not de novo.  399 F. App'x at 981.  But even assuming that the rules articulated in *Morris* are applicable here, *Morris* merely states that in situations like Malik's, the administrator must "have a *reason* for the change."  *Id.* at 984.  But *Morris* makes clear that Malik's interpretation of what that "reason" must be is misguided, as *Morris*'s very next sentence states: "It does not follow, however, . . . that the explanation must be that the plan administrator has acquired new evidence demonstrating that the participant's medical condition has improved."  *Id.*  As explained above, Unum gave several "reasons" for its decision to terminate Malik's benefits, including her essentially normal objective medical testing, her substantial social media activity, and the recommendations of its three reviewing physicians.

For the foregoing reasons, Unum properly decided to terminate Malik's benefits on January 9, 2016.  Accordingly, Unum's Motion for Judgment on the

Record (ECF No. 11) is **GRANTED** and Malik's Motion for Judgment on the

Record (ECF No. 12) is **DENIED**.

      **IT IS SO ORDERED**.

Date: November 30, 2020          <u>s/Stephanie Dawkins Davis</u>
                                       Stephanie Dawkins Davis
                                       United States District Judge